22-MJ-5044-JGD

## AFFIDAVIT OF SPECIAL AGENT PETER MILLIGAN IN SUPPORT OF APPLICATION FOR A CRIMINAL COMPLAINT

I, Peter Milligan, having been duly sworn, do hereby depose and state as follows:

### Agent Background

1. I am a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I have been employed as an ATF Special Agent since 2009 and I am currently assigned to the Boston Group VI Field Office. As an ATF Special Agent my duties include the investigation of violations of laws related to firearms trafficking, firearm possession by felons and other prohibited persons and the use of firearms in drug trafficking and violent crimes, as well as the investigation of violations of law related to explosives and arson.

2. I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy. I have participated in numerous classes of in-service training relating to firearms/narcotics trafficking investigations and arson and explosives investigations. I have been the affiant and/or participated in the execution of numerous state and federal search and arrest warrants pertaining to violations of the federal firearms, narcotics, arson, and explosives laws. I have participated in dozens of investigations relating to the illegal acquisition and sales of firearms and narcotics. During those investigations, I have participated in surveillance, the purchase of firearms, the purchase of narcotics, the execution of search warrants, and I have interviewed witnesses, suspects, and informants. Through my law enforcement training, participation in undercover purchases of firearms and narcotics, surveillance of firearms and narcotics traffickers, interviews of suspects, and participation in search warrants and Title III electronic surveillances, I am familiar with the methods that are most commonly used by unlawful firearms and narcotics traffickers.

**Purpose of Affidavit**

3. I submit this affidavit in support of an application for a criminal complaint alleging that on October 28, 2020, Jacquelyn Mahoney ("Mahoney") distributed 50 grams or more of a mixture and substance containing methamphetamine in violation of Title 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii).

4. Based on the facts set forth in this affidavit, there is probable cause to believe that Mahoney has violated 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii) (distribution of 50 grams or more of a mixture and substance containing methamphetamine).

5. As part of my duties, I am currently participating in an investigation into the criminal activity of Mahoney. I am familiar with the facts and circumstances of this investigation, and I have received information from a variety of sources, including but not limited to other law enforcement officers and agents, and my personal review of records and reports relating to the investigation.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses, among other things. This affidavit is intended to show that there is probable cause for the requested complaint and warrant and does not set forth all of my knowledge about this matter.

**Probable Cause**

7. Between September 2020 and October 2020, a confidential source ("CS") bought methamphetamine from Mahoney on three separate occasions.[1] In all, and as detailed below, on

---

[1] CS has requested that his/her identity not be revealed for fear of reprisal or harm to his/her physical safety. I am aware of CS's identity and have met with CS personally. CS has provided accurate, truthful, and reliable information to law enforcement, including the ATF, the Drug Enforcement Administration, and local police departments in the past and continues to do so to

Case 1:22-cr-10146-MLW   Document 1-1   Filed 02/15/22   Page 3 of 8

22-MJ-5044-JGD

three separate occasions, the CS purchased methamphetamine from Mahoney.

***September 29, 2020 Purchase***

8.   On September 28, 2020, the CS exchanged text messages with Co-Conspirator 1 ("CC-1") regarding the purchase of methamphetamine. The CS sent CC-1 a text message agreeing to purchase an ounce of methamphetamine for $904. I have reviewed a copy of this text message.

9.   The next day, the CS exchanged text messages with CC-1 where they agreed to meet at a residential address in Somerville (the "Somerville address"). Prior to the meeting, agents met with the CS. Agents searched the CS for contraband with negative results. The CS was equipped with an undercover ("UC") vehicle and a recording device which recorded both audio and video, as well as official government funds to purchase the methamphetamine. Law enforcement traveled separately with the CS to the Somerville address.

10.  Upon arriving at the Somerville address, the CS met with CC-1 who told the CS that CC-1's source of supply was running late. According to the CS, prior to the source of supply's arrival, the CS provided CC-1 with $904 in official ATF funds.

11.  Eventually, the source of supply, who was later identified as Mahoney, arrived at the Somerville address. According to the CS, Mahoney removed suspected methamphetamine from a locked box, weighed the substance, and then provided it to the CS. The video recording captures Mahoney weighing the suspected methamphetamine on a scale. According to the CS, during the transaction, CC-1 counted the official funds and provided all but $100 to Mahoney.

---

the present. CS's criminal history includes convictions for assault and battery, forgery, and uttering. CS is presently receiving monetary benefits from the ATF. CS is also seeking protection from potential retaliation based upon CS's cooperation with law enforcement.

12. At the conclusion of the sale, and as captured on the audio recording, Mahoney introduced herself as "Jackie" to the CS.

13. After leaving the meeting location, the CS traveled with law enforcement to a prearranged meeting location. The CS provided law enforcement with the plastic bag containing the suspected methamphetamine.

14. Law enforcement sent the suspected methamphetamine to the Homeland Security Investigations ("HSI") laboratory, which confirmed that the bag contained approximately 27.5 grams of methamphetamine.

15. I have reviewed the audio/video of the purchase. I have similarly reviewed a revoked Massachusetts Driver's License photograph of Mahoney from the Commonwealth of Massachusetts Department of Criminal Justice Information Services database and confirmed that the photo depicts the same person identified as the source of supply, or "Jackie," in the video.

***October 13, 2020 Purchase***

16. On October 12, 2020, the CS called CC-1 to obtain Mahoney's contact information. CC-1 was with Mahoney at the time and put her on the phone. According to the CS, Mahoney agreed to sell the CS one ounce of methamphetamine the next day. Mahoney agreed to deal directly with the CS but explained that CC-1 would still need a cut of the sale for brokering the introduction. Mahoney then provided the CS with two phone numbers to contact her.

17. That night, the CS and Mahoney exchanged text messages where they confirmed the purchase. The CS agreed to pay Mahoney $1,000 for the methamphetamine. Mahoney instructed the CS to meet her at a residential address in Boston (the "Boston address"). I have reviewed a copy of this text message exchange.

18. On October 13, 2020, prior to the meeting, agents met with the CS. Agents

searched the CS for contraband with negative results. The CS was equipped with a UC vehicle and a recording device which recorded both audio and video, as well as official government funds to purchase the methamphetamine. Law enforcement traveled with the CS to the Boston address.

19. I have reviewed the audio/video of this purchase. The video does not capture Mahoney or the methamphetamine; however, the audio captures the substance of the conversation between Mahoney and the CS, which, based on my training and experience, I believe is consistent with the sale of narcotics.

20. According to the CS, during the purchase, the CS observed drug paraphernalia in the apartment. The CS observed Mahoney retrieve a plastic weekly pill planner and remove a baggie containing suspected methamphetamine and weigh the substance on a scale. According to the CS, Mahoney then provided the CS with the suspected methamphetamine and the CS provided Mahoney with the official funds.

21. As noted above and as captured on the audio recording, the CS and Mahoney discuss the purchase and sale of drugs. Mahoney asked the CS where the CS "moves this stuff" and the CS responded, "Haverhill… everybody loves this and the dope." Mahoney then stated that she could secure very good dope. Based on my training and experience, I understand dope to be a reference to fentanyl. Additionally, Mahoney explained that the night before, she paid CC-1 an "eight-ball" for CC-1's cut. I similarly understand an "eight-ball" to be common street slang for 3.5 grams of a controlled substance.

22. At the end of the purchase, and as captured on the audio recording, Mahoney tells the CS that she is "Jacquelyn Rose" on Facebook. I have reviewed a Facebook profile of Jacquelyn Rose which contains a profile picture that appears to be Mahoney.

23. After leaving the Boston address, the CS was kept under surveillance until he/she

arrived at a prearranged meeting location. The CS provided law enforcement with the plastic bag containing the suspected methamphetamine.

24. Law enforcement subsequently sent the suspected methamphetamine to the HSI laboratory, which confirmed that the bag contained approximately 27.81 grams of methamphetamine.

***October 28, 2020 Purchase***

25. According to the CS, on October 26, 2020, the CS and Mahoney spoke on the phone and agreed to the sale of two ounces of methamphetamine for $2,000. They agreed to meet on October 28. On October 27, 2020, the CS and Mahoney exchanged text messages. Mahoney told the CS to meet her at the Westin Hotel in the Boston Seaport (the "Westin Seaport"). I have reviewed this text message exchange.

26. On October 28, prior to the meeting, agents met with the CS. Agents searched the CS for contraband with negative results. The CS was equipped with a UC vehicle and a recording device which recorded both audio and video, as well as official government funds to purchase the methamphetamine. Law enforcement traveled separately with the CS to the Westin Seaport.

27. As the CS traveled to the Westin Seaport, the CS could not get ahold of Mahoney. According to the CS, eventually, Co-Conspirator 2 ("CC-2") called the CS and stated that CC-2 was aware of the purchase and asked how the CS wanted to receive the methamphetamine. The CS advised that each ounce should be in a separate bag.

28. Before arriving at the Westin Seaport, the CS had a text message exchange with Mahoney where Mahoney advised that she was staying in room 1520. I have reviewed this exchange. The CS then went up to room 1520.

29. I have reviewed the audio/video of the purchase. The video captures Mahoney,

CC-2, and an unknown male, but it does not capture the suspected methamphetamine. The audio captures the substance of the conversation between Mahoney and the CS, which, based on my training and experience, I believe is consistent with the sale of narcotics.

30. According to the CS, Mahoney handed the CS the suspected methamphetamine and directed the CS to weigh the bags on a scale. The CS weighed the bags and provided the official funds to Mahoney.

31. During the purchase, and as captured on the audio, the CS told Mahoney and the others in the room that the CS planned to sell one of the packages in Maine and that if the CS sold the drugs quickly, the CS planned to come back to Mahoney to purchase additional methamphetamine. In response, Mahoney stated, "I got you," and "the more, the better."

32. After leaving the meeting location, the CS traveled with law enforcement to a prearranged location. The CS provided law enforcement with the plastic bags containing the suspected methamphetamine.

33. Law enforcement subsequently sent the suspected methamphetamine to the HSI laboratory, which confirmed that the bags contained approximately 56.95 grams of methamphetamine.

22-MJ-5044-JGD

34. Based on the foregoing, there is probable cause to believe that, on October 28, 2020, Mahoney distributed 50 grams or more of a mixture and substance containing methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(viii).

Sworn to under the pains and penalties of perjury.

_____
Peter Milligan
Special Agent
Bureau of Alcohol Tobacco and Firearms

Sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on February __Feb 15, 2022__, 2022

_____
Judith G. Dein
United States Magistrate Judge